**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **ADAM STANLEY** and **JOHNNY KIMBLER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**SONITOR TECHNOLOGIES, INC.** and **SANFORD HEALTH NETWORK**,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Adam Stanley and Johnny Kimbler ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this class action Complaint against Defendants Sonitor Technologies, Inc. ("Sonitor") and Sanford Health Network ("Sanford") (collectively, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Defendant Sonitor is a healthcare technology company that develops real-time location systems (RTLS) and workflow automation software that enable hospitals to track patients, staff, medical equipment, and other assets indoors to improve operational efficiency, patient flow, and safety.[1]

[1] *About Sonitor*, SONITOR, https://sonitor.com/about/ (last visited August 11, 2026).

3. Defendant Sanford is an integrated health system that provides comprehensive medical care, specialty services, health insurance, and research across hospitals, clinics, and other healthcare facilities throughout the Midwest and surrounding regions.[2]

4. Based on a case study published to Sonitor's website on November 23, 2022, Defendant Sanford used Defendant Sonitor's RTLS platform to automate patient tracking and nursing workflows, improving patient flow, increasing staff efficiency, and enhancing patient safety through real-time location intelligence.[3]

5. As such, Defendants store a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about their patients and employees. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

6. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the Data Breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their patients' and employees' PII/PHI.

7. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendants' failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

---

[2] *About Us*, SANFORD HEALTH, https://www.sanfordhealth.org/about (last visited August 11, 2026).

[3] *Sanford Health*, SONITOR, https://sonitor.com/case-studies/sanford-health/ (last visited August 11, 2026).

8. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

9. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, their patients' and employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10. Plaintiff Adam Stanley is a natural person and a citizen of Sioux Falls, South Dakota. He is domiciled in South Dakota, where he intends to remain.

11. Plaintiff Johnny Kimbler is a natural person and a citizen of Fargo, North Dakota. He is domiciled in North Dakota, where he intends to remain.

12. Defendant Sonitor Technologies, Inc. is a corporation formed in Florida, with its principal place of business at 1850 Cypress Lake Drive, Suite 350, Orlando, Florida 32837.

13. Defendant Sanford Health Network is a domestic nonprofit corporation formed in South Dakota, with its principal place of business at 1305 W. 18th St., Sioux Falls, South Dakota 57105.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Minimal diversity exists because at least one Plaintiff is a citizen of a State different from at least one Defendant. And there are over 100 putative Class Members.

15. This Court has personal jurisdiction over Defendant Sonitor because is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida. This Court also has personal jurisdiction over Defendant Sanford because it

uses and contracts for services provided by Defendant Sonitor, including services that are relevant to the claims asserted in this action, thereby establishing sufficient contacts with this District related to the claims at issue.

16. Venue is proper in this Court because Defendant Sonitor's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII/PHI of Plaintiffs and the Class***

17. Defendant Sonitor is a healthcare technology company that develops real-time location systems (RTLS) and workflow automation software that enable hospitals to track patients, staff, medical equipment, and other assets indoors to improve operational efficiency, patient flow, and safety.[4]

18. Defendant Sanford is an integrated health system that provides comprehensive medical care, specialty services, health insurance, and research across hospitals, clinics, and other healthcare facilities throughout the Midwest and surrounding regions.[5]

19. Based on a case study published to Sonitor's website on November 23, 2022, Defendant Sanford used Defendant Sonitor's RTLS platform to automate patient tracking and nursing workflows, improving patient flow, increasing staff efficiency, and enhancing patient safety through real-time location intelligence.[6]

---

[4] *About Sonitor*, SONITOR, https://sonitor.com/about/ (last visited August 11, 2026).
[5] *About Us*, SANFORD HEALTH, https://www.sanfordhealth.org/about (last visited August 11, 2026).
[6] *Sanford Health*, SONITOR, https://sonitor.com/case-studies/sanford-health/ (last visited August 11, 2026).

20. As part of their business, Defendants receive and maintain the PII/PHI of thousands of their patients and employees.

21. In collecting and maintaining the PII/PHI, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI.

22. Under state and federal law, businesses like Defendants have duties to protect their patients' and employees' PII/PHI and to notify them about breaches.

23. Defendant Sonitor recognizes these duties, declaring in its "Privacy Policy" that:

a. "The security of your Personal Information is important to us."[7]

b. "We will disclose your Personal Information where required to do so by law or subpoena."[8]

c. "We will not use or share your information with anyone except as described in this Privacy Policy."[9]

24. Defendant Sanford recognizes these duties, declaring in its "Privacy Statement" that:

a. "Sanford Health acknowledges and respects any individual's right to privacy. We take your concerns related to privacy and security seriously."[10]

---

[7] *Privacy Policy*, SONITOR, https://sonitor.com/privacy-policy-website/ (last visited August 11, 2026).
[8] *Id*.
[9] *Id*.
[10] *Privacy Statement*, SANFORD HEALTH, https://www.sanfordhealth.org/privacy-statement (last visited August 11, 2026).

b. "We will retain your information for as long as needed to provide you services, comply with our legal obligations, resolve disputes, and enforce our agreements."[11]

c. "Sanford Health provides reasonable and appropriate security measures to protect our website content and any personal information you may provide against foreseeable hazards. When you enter sensitive information (such as a credit card number) on our forms, we encrypt the transmission of that information using secure socket layer technology (SSL). When you come across a web page that is secured, your browser will likely display a 'closed lock' or other symbol to inform you that SSL has been enabled. The web address should start with 'https://" rather than "http://'. SSL allows a secure connection between your web browser and a web server."[12]

***Defendants' Data Breach***

25. On or around July 7, 2026, Defendant Sonitor was hacked in the Data Breach.[13]

26. Worryingly, a ransomware monitoring group published a notification attributing responsibility for the Data Breach to a group known as "PEAR."[14]

27. On information and belief, PEAR maintains a Data Leak Site ("DLS") on the dark web where it publishes stolen data in order to pressure organizations that were subject to a data

[11] *Id.*
[12] *Id.*
[13] *Sonitor Technologies*, RANSOMWARE.LIVE, https://www.ransomware.live/id/U29uaXRvciBUZWNobm9sb2dpZXNAcGVhcg (last visited August 11, 2026).
[14] *Id.*; *see also Pear Launches Ransomware Attack on Sonitor Technologies*, DEXPOSE, https://www.dexpose.io/pear-launches-ransomware-attack-on-sonitor-technologies/ (last visited August 11, 2026).

breach. On or around July 30, 2026, PEAR created a post on its dark web DLS stating that it had hacked Defendant.[15]

28. PEAR's dark web post contained Defendant's name, logo, description, revenue, a link to Defendant's website, and samples of unredacted victim data below Defendant's description.

29. PEAR has reportedly leaked 560 of sensitive data, including, "Financials, HR, PII & PHI records, Business Operations, Partners and Vendors Data, Clients' and Customers' Private Data, Multiple Technical and Developments Data, Source Code, Mailboxes & Email Correspondence, Databases, etc."[16]

30. This indicates that PEAR hacked Defendant's computer network, stole the sensitive PII/PHI contained therein, and published the stolen PII/PHI on the dark web.

31. Because of Defendants' Data Breach, at least the following types of PII/PHI were compromised:

a. Name;

b. Date of birth;

c. Social Security number;

d. Financial information;

e. Driver's license information; and

f. Healthcare information:

32. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendants'

---

[15] *Id.*
[16] *Id.*

custody and control. And upon information and belief, the putative Class is over one hundred members—as it includes their patients and employees.

33. And yet, Defendant has failed to begin notifying the Class.

34. Upon information and belief, Defendant has yet to send individualized notice letters to victims of the Data Breach and does not have mailing information for all individuals who are victims of the Data Breach.

35. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

36. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendants caused widespread injury and monetary damages.

37. Defendants have done little to remedy their Data Breach.

38. Because of Defendants' Data Breach, the sensitive PII/PHI of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***PEAR & the Dark Web***

39. Worryingly, the cybercriminals that obtained Plaintiffs' and Class Members' PII/PHI appear to be the notorious cybercriminal group "PEAR."[17]

---

[17] *Pear Launches Ransomware Attack on Sonitor Technologies*, DEXPOSE, https://www.dexpose.io/pear-launches-ransomware-attack-on-sonitor-technologies/ (last visited August 11, 2026); *Sonitor Technologies*, RANSOMWARE.LIVE, https://www.ransomware.live/id/U29uaXRvciBUZWNobm9sb2dpZXNAcGVhcg (last visited August 11, 2026).

40. PEAR is an especially notorious cybercriminal group. In fact, ransomware monitoring groups have stated that PEAR has already had at least 107 victims.[18]

41. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals like PEAR is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[19]

42. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[20]

43. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully acquired data.

44. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[21]

45. Thus, on information and belief, Plaintiffs' and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

***Plaintiffs' Experiences and Injuries***

---

[18] *Id.*

[19] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[20] John Krebs, *The dark web: What your business needs to know*, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

[21] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

Adam Stanley

46. Plaintiff Adam Stanley is a current patient of Defendant Sanford Health; he has been a patient there since 2000.

47. Thus, Defendants obtained and maintained Plaintiff's PII/PHI.

48. As a result, Plaintiff was injured by Defendants' Data Breach.

49. Plaintiff is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

50. Plaintiff provided his PII/PHI to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiffs' PII/PHI and have a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

51. Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII/PHI.

52. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

53. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

54. Through their Data Breach, Defendants compromised Plaintiff's PII/PHI.

55. Plaintiff has spent—and will continue to spend—significant time and effort monitoring their accounts to protect himself from identity theft.

56. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails and text messages to the same contact information he provided to Defendant Sanford.

57. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

58. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

59. Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

60. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendants were required to adequately protect.

61. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

62. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

63. Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

Johnny Kimbler

64. Plaintiff Johnny Kimbler is a current patient of Defendant Sanford.

65. Thus, Defendants obtained and maintained Plaintiff's PII/PHI.

66. As a result, Plaintiff was injured by Defendants' Data Breach.

67. Plaintiff is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

68. Plaintiff provided his PII/PHI to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's PII/PHI and have a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

69. Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII/PHI.

70. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

71. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

72. Through their Data Breach, Defendants compromised Plaintiff's PII/PHI.

73. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

74. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam phone calls.

75. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

76. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

77. Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

78. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendants were required to adequately protect.

79. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

80. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

81. Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

82. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[22] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[23]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[24]

c. 89% of consumers stated that "I care about data privacy."[25]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[26]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[27]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[28]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

---

[22] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[23] *Id*. at 3.
[24] *Id*.
[25] *Id*. at 9.
[26] *Id*.
[27] *Id*.
[28] *Id*. at 11.

83. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendants' possession—and is thus at risk for future breaches so long as Defendants fails to take appropriate measures to protect the PII/PHI.

***Substantially Increased Risk of Identity Theft and Fraud***

84. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

85. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

86. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

87. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

88. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[29] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[30] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

89. The unencrypted PII/PHI of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without

[29] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[30] *Id*.

the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII/PHI.

90. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

91. In particular, the theft of Social Security numbers—in combination with other PII/PHI (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

92. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[31] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[32]

93. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[31] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[32] *Id*.

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

94. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[33]

95. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

96. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

97. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

---

[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

98. Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[34]

99. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[35] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[34] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

100. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

101. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[36]

102. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

[36] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

103. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

104. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

105. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

106. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

107. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[37]

108. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[37] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

lesser IT defenses and a high incentive to regain access to their data quickly."[38]

109. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[39]

110. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Could Have Prevented the Data Breach***

111. Data breaches are preventable.[40] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[41]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[42]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including

---

[38] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[39] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sept. 11, 2023).

[40] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[41] *Id.* at 17.

[42] *Id.* at 28.

encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [43]

***Defendants Failed to Follow FTC Guidelines***

112. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

113. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[44] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

114. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

115. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

---

[43] *Id.*

[44] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

116. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

117. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their patients' and employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

118. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

119. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

120. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

121. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

***Defendants Violated HIPAA***

122. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[45]

[45] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

123. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[46]

124. The Data Breach resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

[46] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

125. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

126. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach affecting Defendants in July 2026, including all those individuals who received notice of the Data Breach.

127. Excluded from the Class are Defendants, their affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

128. Plaintiffs reserve the right to amend the class definition.

129. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

130. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

131. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least hundreds of members.

132. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

133. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

134. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII/PHI;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

135. <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for

their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

136. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

137. Plaintiffs and the Class (or their third-party agents) entrusted their PII/PHI to Defendants on the premise and with the understanding that Defendants would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

138. Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

139. Defendants have full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

140. Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' PII/PHI.

141. Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in their care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

142. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

143. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

144. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

145. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship

arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendants with their confidential PII/PHI, a necessary part of obtaining services from Defendants.

146. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII/PHI.

147. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII/PHI.

148. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

149. Similarly, under HIPAA, Defendants had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

150. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

151. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendants hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII/PHI —whether by malware or otherwise.

152. PII/PHI is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

153. Defendants improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

154. Defendants breached these duties as evidenced by the Data Breach.

155. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

156. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

157. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused

and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

158. Defendants have admitted that the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

159. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

160. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

161. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

162. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

163. Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

164. Plaintiffs and Class Members (or their third-party agents) were required to provide their PII/PHI to Defendants as a condition of receiving services/employment provided by Defendant. Plaintiffs and Class Members (or their third-party agents) provided their PII/PHI to Defendants or their third-party agents in exchange for Defendants' services/employment.

165. The contracts entered into by Plaintiffs' and Class Members' agents were made for the direct benefit of Plaintiff and the Class.

166. Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

167. Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

168. Plaintiffs and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII/PHI to Defendants or their third-party agents in exchange for services/employment.

169. In turn, and through internal policies, Defendants agreed to protect and not disclose the PII/PHI to unauthorized persons.

170. In their Privacy Policies, Defendants represented that they had a legal duty to protect Plaintiffs' and Class Member's PII/PHI.

171. Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

172. After all, Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII/PHI to Defendants (or their third-party agents) in the absence of such an agreement with Defendant.

173. Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

174. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

175. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

176. Defendants materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendants created, received, maintained, and transmitted.

177. In these and other ways, Defendants violated their duty of good faith and fair dealing.

178. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

179. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

180. Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**<u>THIRD CAUSE OF ACTION</u>**
**Invasion of Privacy—Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

181. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

182. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

183. Defendants owed a duty to their patients and employees, including Plaintiffs and the Class, to keep this information confidential.

184. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII/PHI is highly offensive to a reasonable person.

185. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be

kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

186. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

187. Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

188. Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

189. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

190. As a proximate result of Defendants' acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

191. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

192. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendants with their inadequate cybersecurity system and policies.

193. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII/PHI of Plaintiffs and the Class.

194. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

195. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

196. This claim is pleaded in the alternative to the breach of implied contract claim.

197. Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII/PHI to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit.

198. Defendants appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

199. Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

200. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI.

201. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

202. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII/PHI and (2) employment and/or payment because Defendants failed to adequately protect their PII/PHI.

203. Plaintiffs and Class Members have no adequate remedy at law.

204. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

## FIFTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

205. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

206. Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' PII/PHI, Defendants became a fiduciary by their undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

207. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII/PHI.

208. Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII/PHI had they known the reality of Defendants' inadequate data security practices.

209. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII/PHI.

210. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

211. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

212. Plaintiffs incorporate by reference paragraphs 1–135 as if fully set forth herein.

213. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

214. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

215. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendants breach of their duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

216. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

217. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

218. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

219. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

220. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Date: August 11, 2026

Respectfully submitted,

By: *<u>/s/: Mariya Weekes</u>*

Mariya Weekes
**MILBERG PLLC**
333 SE 2nd Ave, Suite 2000
Miami, FL 33131
Tel: (786) 206-9057
mweekes@milberg.com

*Attorneys for Plaintiffs and Proposed Class*